**Pasha S. ANWAR, et al., Plaintiffs,**

v.

**FAIRFIELD GREENWICH LIMITED, et al., Defendants.**

**No. 09 Civ 0118(WM).**

United States District Court, S.D. New York.

Aug. 20, 2010.

David A. Barrett, Boies, Schiller & Flexner, LLP, Christopher Lovell, Victor E. Stewart, Jody Krisiloff, Lovell Stewart Halebian Jacobson LLP, James Abram Harrod, III, Carl Lester Stine, Chet Barry Waldman, Robert Craig Finkel, Wolf Popper LLP, Robert Alan Wallner, Jean Lee, Kent Andrew Bronson, Kristi Stahnke McGregor, Robert Alan Wallner, Milberg LLP, William M. O'Connor, Crowell & Moring LLP, Brian Dale Graifman, David Alan Gehn, Gusrae, Kaplan, Bruno & Nusbaum, PLLC, Catherine A. Torrell, Cohen Milstein Sellers & Toll P.L.L.C., Daniel W. Krasner, Demet Basar, Gregory Mark Nespole, Wolf Haldenstein Adler Freeman & Herz LLP, David Robert Kromm, Hillary Sobel, Jeffrey Charles Zwerling, Robert S. Schachter, Stephanie Elizabeth Kirwan, Stephen Leland Brodsky, Richard A. Speirs, Zwerling, Schachter & Zwerling, David J. Molton, Martin S. Siegel, Brown Rudnick LLP, Joseph Emanuel Neuhaus, Sullivan And Cromwell, LLP, New York, NY, Sashi Bach Boruchow, Stuart Harold Singer, Boies, Schiller & Flexner LLP, Fort Lauderdale, FL, Matthew W. Cheney, Crowell & Moring LLP, Daniel S. Sommers, Joshua Seth Devore, Steven Jeffrey Toll, Cohen Milstein Sellers & Toll P.L.L.C., Washington, DC, Paul Edouard Dans, Rivero Mestre & Cas-

tro, Jeffrey F.D. Bogert, Bogert & Rembold, P.L., Laurence Edward Curran, III, Curran & Associates, Coral Gables, FL, David Alan Rothstein, Jeffrey Brett Kaplan, Lorenz Michel Pruss, Dimond Kaplan & Rothstein, Coconut Grove, FL, Robert E. Linkin, Dimond Kaplan & Rothstein, PA, Richard E. Brodsky, The Brodsky Law Firm, Miami, FL, Michael Jules Aguirre, Aguirre, Morris & Severson LLP, San Diego, CA, for Plaintiffs.

ABN Amro Life S.A., pro se.

Mark Geoffrey Cunha, Michael Joseph Chepiga, Paige Elizabeth Fleming, Paul Jacob Sirkis, Peter Eric Kazanoff, Sara Ann Ricciardi, Simpson Thacher & Bartlett LLP, Glenn Kurtz, White & Case LLP, Andrew J. Levander, David Scott Hoffner, Jennie Boehm Krasner, Dechert, LLP, Adam K. Grant, Daniel R. Benson, Daniel J. Fetterman, Marc E. Kasowitz, Kasowitz, Benson, Torres & Friedman, LLP, Helen Virginia Cantwell, Mark P. Goodman, Debevoise & Plimpton, LLP, Eliot Lauer, Curtis, Mallet-Prevost, Colt & Mosle, LLP, Andrew M. Genser, Kirkland & Ellis LLP, Gabrielle Sean Marshall, Sarah Loomis Cave, William R. Maguire, Hughes Hubbard & Reed LLP, Edward M. Spiro, Robert James Anello, Claudio Godinez Roumainochoa, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., Michael Joseph Moscato, Timothy Neil McCabe, Curtis, Mallet-Prevost, Colt & Mosle, LLP, Jonathan David Cogan, Michael Sangyun Kim, Kobre & Kim LLP, Sharon L. Nelles, Allison Caffarone, Bradley Paul Smith, Patrick Barrett Berarducci, Sharon L. Nelles, Sullivan & Cromwell, LLP, Catherine A. Torell, Cohen Milstein Sellers & Toll P.L.L.C., New York, NY, Amanda McGovern, Dyanne Eyce Feinberg, Elizabeth A. Izquierdo, Lewis Nathan Brown, Terence Michael Mullen, Gilbride Heller & Brown P.A., Hilarie Bass, Ricardo Alejandro Gonzalez, Greenberg Traurig, Miami, FL, Amy E. Crawford, Brenton Rogers, Emily Nicklin, Timothy A. Duffy, Kirkland & Ellis LLP, Chicago, IL, Diane Lee McGimsey, Sullivan And Cromwell LLP, Los Angeles, CA, Bruce Allen Baird, Covington & Burling, L.L.P., Washington, DC, for Defendants.

## DECISION AND AMENDED ORDER

VICTOR MARRERO, District Judge.

This case arises from already-commenced arbitration between plaintiffs Standard Chartered Bank International (Americas) Ltd. ("Standard Chartered") and StanChart Securities International, Inc. ("StanChart") (together with Standard Chartered, "Plaintiffs") and thirty-eight individuals and entities (collectively, "Defendants") who held investment accounts with Plaintiffs. Those accounts were invested in Fairfield Sentry Ltd. ("Fairfield Sentry"), a feeder fund that in turn invested almost exclusively with Bernard L. Madoff Investment Securities ("BMIS"), a now defunct Ponzi scheme. Defendants claim in their arbitration that Plaintiffs violated various duties in recommending that Defendants invest in Fairfield Sentry.

Arbitration was commenced by Defendants on September 17, 2009. On June 15, 2010, Plaintiffs filed a complaint with this Court requesting declaratory and injunctive relief related to the arbitration. A month later, on July 14, 2010, Plaintiffs moved for a temporary restraining order and a preliminary injunction. By Order dated July 23, 2010, the Court denied Plaintiffs' motion. The Court now sets forth its findings, reasoning, and conclusions.

## I. BACKGROUND [1]

Defendants, comprised of individuals residing in Chile, corporations organized

---

1. The facts below are taken from the following documents and any exhibits submitted therewith: Complaint for Declaratory and In-

under Chilean law, and corporations organized under the laws of the Cayman Islands, held, prior to December 2008, twenty-four separate investment accounts at Standard Chartered. Standard Chartered, which, like StanChart, is a subsidiary of Standard Chartered Bank, is a so-called "Edge Act corporation," meaning it is organized under federal law for the purposes of engaging in international or foreign banking. *See* 12 U.S.C. § 611; *Miranda de Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351, 1352 n. 1 (11th Cir.2001).

## A. *STANDARD CHARTERED BROKERAGE AGREEMENTS*

As noted, Defendants purchased shares of Fairfield Sentry through their accounts at Standard Chartered. These accounts were governed by brokerage client agreements containing three provisions relevant to the instant proceedings.[2] (*See* Berarducci Decl., Ex. B ("Standard Chartered Brokerage Agreement").) First, ¶ 6 requires arbitration for "[a]ny controversy arising out of, or relating to" Defendants' accounts, transactions with Standard Chartered's brokers, or the Standard Chartered Brokerage Agreement itself. (*Id.* ¶ 6.) This paragraph also specifies that arbitration is to occur before the American Arbitration Association ("AAA") or certain other bodies. (*See id.*) Paragraph 6 also provides that "[n]o person shall bring a putative or certified class action to arbitration...." (*Id.*)

Next, ¶ 7 sets forth certain rules concerning communications between Defendants and Standard Chartered. In particular, "[c]ommunications mailed to [a Defendant] at the address [Defendant] provided for delivery of written communications[ ]shall be deemed to have been personally delivered to [Defendant], and [Defendant] agree[s] to waive all claims resulting from failure to receive such communications." (*Id.* ¶ 7.)

Finally, ¶ 8 provides that Standard Chartered

shall have the right to amend this agreement by modifying or rescinding any of its existing provisions or by adding any new provision. Any such amendment shall be effective as of a date to be established by [Defendants]. [Defendants] understand and acknowledge that [Standard Chartered] may modify or change the terms and conditions by mailing a written notice or a new printed agreement to [Defendants]. [Defendants'] use of the Account after delivery of notice of the change constitutes [Defendants] agreement to be bound hereby. This agreement is not subject to oral modifications.

(*Id.* ¶ 8.) Paragraph 8 concludes by noting that "[t]his agreement, along with the Appliction and any other agreements [Defen-

junctive Relief, dated June 15, 2010; Plaintiffs' Memorandum of Law In Support of Their Application for a Temporary Restraining Order and Motion for a Preliminary Injunction, dated July 14, 2010; Declaration of Patrick R. Berarducci, dated July 14, 2010 ("Berarducci Decl."); Supplemental Declaration of Steven Glover, dated July 13, 2010; Defendants' Memorandum of Law in Opposition to Plaintiffs' Application for a Temporary Restraining Order and Motion for a Preliminary Injunction, dated July 21, 2010; Declaration of Samuel I. Schwartz, dated July 21, 2010. Except where specifically cited, no fur-

ther reference to these documents will be made.

2. Standard Chartered was formerly known as American Express Bank International and changed its name in August 2008 after its parent company was acquired by Standard Chartered PLC in February 2008. The Standard Chartered Brokerage Agreements were originally between Defendants and American Express Bank International. No party disputes that the Standard Chartered Brokerage Agreements are binding on Standard Chartered.

dants] have signed, constitutes the entire agreement between [Defendants] and [Standard Chartered]." (*Id.*)

Defendants each signed a separate Standard Chartered Brokerage Agreement. In total, twenty four agreements were signed, one for each account, by thirty-eight customers.[3]

## B. *STANDARD CHARTERED NON-DISCRETIONARY INVESTMENT SERVICES AGREEMENTS*

The Standard Chartered Brokerage Agreements were not the only contracts between the parties. Certain unspecified Defendants also signed Nondiscretionary Investment Services Agreements for at least thirteen of the accounts. (*See* Berarducci Decl., Ex. C ("NISA").)[4] The NISAs contain arbitration provisions similar to the Standard Chartered Brokerage Agreements-providing for arbitration "in accordance with the rules of the AAA" in Miami—Dade County, Florida—but containing no express limitation on class action proceedings. (NISA ¶ 9(a).) The NISAs are expressly governed by Florida law. (*See id.* ¶ 9(b).) Standard Chartered retained the ability to amend the NISAs, as long as it "provide[s] notice of any such amendment or change to [Defendants] by mail, and all such amendments and changes shall take effect, with respect to the Investment Account, 30 days after the date on which such notice is mailed or on any later date specified in such notice," unless otherwise prohibited. (*Id.* ¶ 9(c).)

The section of the NISA dealing with communications between Standard Chartered and Defendants is more complex than similar language in the Standard Chartered Brokerage Agreements. First, except for certain documents about securities or investments, "[a]ll notices and communications to [a Defendant] . . . shall be effective, deemed, received and constitute personal delivery" to a Defendant in three circumstances. (*Id.* ¶ 12(b).) First, "when sent, whether by mail or by telex, fax, E-mail, or other telecommunications media, to [a Defendant's] address specified in [Standard Chartered's] records, as it may be modified from time to time." (*Id.*) Next, "if sent by messenger, when left at such address." (*Id.*) Finally, if "[Defendant] requested hold-mail for correspondence in any relevant 'hold mail' agreement or other account opening document, when placed in [Defendant's] 'hold-mail' file." (*Id.*) However delivered, "[a]ll such notices and communcations . . . shall be deemed to be correct and conclusive against [Defendants] if not objected to in writing by [Defendants] within five days of the date they are deemed received by [Defendants]." (*Id.*) As far as "hold mail"

---

3. Plaintiffs also contend that the Standard Chartered Brokerage Agreements contain a clause requiring it to be construed under Minnesota law. The Court is not persuaded that such a conclusion is immediately apparent from the face of the contracts, which addresses Minnesota law only in a paragraph entitled "Settlement" and specifies that "[t]o the extent permitted by the laws of the State of Minnesota, the reasonable costs and expenses of collection of the debit balance and any unpaid deficiency in [a Defendant's] accounts with [Standard Chartered], including but not limited to attorney's fees incurred and payable or paid by [Standard Chartered], shall be payable to [Standard Chartered] by [a

Defendant]." (Standard Chartered Brokerage Agreement ¶ 4.) By this plain language, Minnesota law appears to be relevant only to the settlement of debit collection costs and not to any other portion of the Standard Chartered Brokerage Agreement. The issue, however, is largely moot, as the contract was later unambiguously amended to be governed by New York law. (*See* Berarducci Decl., Ex. F at 1.)

4. Similarly to the Standard Chartered Brokerage Agreements, the NISAs indicate agreement between certain Defendants and Standard Chartered's former name, American Express Bank International.

arrangements are concerned, communications "shall be deemed to have been delivered to [Defendant] for all purposes on the date deposited by [Standard Chartered] in [Standard Chartered]'s 'hold mail' files." (*Id.*)

Finally, the NISAs also note that they are "intended to be read and applied in conjunction with the other account agreements and other documents entered into by or applicable to [Defendant]" but "to the extent there is any conflict or inconsistency between the provisions of [the NISA] and such other agreements and documentation, the provisions of [the NISA] shall control as to the Investment Account." (*Id.* ¶ 9(e).)

### C. TRANSFER OF ASSETS TO STANCHART AND MADOFF'S CONFESSION

On October 1, 2008, Standard Chartered sent its customers a letter informing them that (1) their Standard Chartered investment accounts were to be transferred to StanChart, (2) the Standard Chartered Brokerage Agreements would continue to apply to the investments transferred to StanChart, and (3) the Standard Chartered Brokerage Agreements were amended to be governed by New York law. (*See* Berarducci Decl., Ex. F.) Both the transfer to StanChart and the New York governing law amendment were to be effective on November 7, 2008, five weeks after the date on the letter. (*See id.*) This transfer of accounts from Standard Chartered to StanChart was mandated by the Gramm–Leach–Bliley Act of 1999 and was required to occur by January 1, 2009. *See* Regulation R, 72 Fed. Reg. 56,514 (Oct. 3, 2007) (to be codified at 12 C.F.R. pt. 218).

On December 11, 2008, about one month after the transfer to StanChart was set to begin, Bernard Madoff confessed to the world that BMIS was actually a massive Ponzi scheme. The parties differ greatly on whether the account transfers from Standard Chartered to StanChart began in November 2008, or were ever completed.

### D. RETROACTIVE MODIFICATION OF THE STANDARD CHARTERED BROKERAGE AGREEMENTS

In the aftermath of Madoff's revelation, StanChart attempted to retroactively modify the Standard Chartered Brokerage Agreements between Defendants and StanChart by substituting an entirely new agreement. On March 1, 2009, StanChart mailed to each StanChart account holder a new brokerage agreement, (*see* Berarducci Decl., Ex. G ("StanChart Brokerage Agreement")), and a cover letter noting that the new agreement "replac[ed] any previous version" and was effective as of a date five months in the past: November 5, 2008. (*See* Berarducci Decl., Ex. H. ("Retroactive Letter").) The record does not indicate what became of the NISAs or if StanChart or Standard Chartered made any attempts to retroactively modify them.

The StanChart Brokerage Agreements were in many ways identical to the previous Standard Chartered Brokerage Agreements. The provisions allowing amendment of the agreements are the same. (*See* StanChart Brokerage Agreement ¶ 10.) The paragraph on communication was virtually the same, except that it noted that mailing of communications to an address provided by a Defendant was deemed to be personal delivery "whether or not actually received." (*Id.* ¶ 9.) The prior Standard Chartered Brokerage Agreement did not include the phrase "whether or not actually received." (*See* Standard Chartered Brokerage Agreement ¶ 7.) The StanChart Brokerage Agreement also explicitly provides that New York law governs it. (*See* StanChart Brokerage Agreements ¶ 25.) Finally, the

arbitration provisions were the same except for one crucial difference—the AAA was not designated to arbitrate any claims and the Financial Industry Regulatory Authority ("FINRA") was substituted in its place. (*See id.* ¶¶ 6–7.)

### E. *ARBITRATION PROCEEDINGS*

Seven months after StanChart's attempted retroactive modification of the Standard Chartered Brokerage Agreements, Defendants filed a Statement of Claims and Demand For Arbitration with the International Centre for Dispute Resolution ("ICDR"), a division of AAA, on September 17, 2009. (*See* Berarducci Decl., Ex. I.) Claims on behalf of all Defendants were brought in one proceeding. The respondents originally named in the arbitration included, in addition to Standard Chartered and StanChart, two Standard Chartered affiliates, a Standard Chartered Investment Specialist, and StanChart's former Chief Executive Officer.

Defendants' claims before the arbitral panel are essentially that Plaintiffs recommended investment in Fairfield Sentry without conducting diligence on the fund. Such claims are similar to those consolidated in a number of other cases currently before this Court and with which the present action has been consolidated for coordination of pretrial proceedings. *See Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118, 728 F.Supp.2d 372, 387 n. 1, 2010 WL 3341636 (S.D.N.Y. Aug. 18, 2010) ("*Anwar*") (explaining consolidation of cases.). Pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b)(3)(B) ("PSLRA"), a stay has been entered on all discovery related to the Standard Chartered cases while motions to dismiss the complaints are pending.

On October 20, 2009 Plaintiffs objected via letter to the ICDR that AAA had no jurisdiction over StanChart and that Defendants' claims could not be heard in one proceeding as filed. A month later, on November 18, 2009, Plaintiffs entered a statement of defenses and reiterated their objections to ICDR. On November 25, 2009, Defendants sent Plaintiffs a lengthy document request, to which Plaintiffs replied on January 12, 2010, asserting (among other arguments) that documents should not be turned over pursuant to the PSLRA stay in the cases pending before this Court in *Anwar*.

On February 2, 2010, an initial preliminary hearing was held before a AAA arbitral panel (the "AAA Tribunal"). Plaintiffs moved for a stay of discovery by advancing their PSLRA argument, a request the AAA Tribunal denied. On February 19, 2010, Plaintiffs again requested a stay of discovery via letter to the AAA Tribunal, a request that was again denied on March 2, 2010.

On March 18, 2010, the parties signed a letter agreement concerning Defendants' document requests that resolved many of the disagreements between the parties.

### F. *THE AAA TRIBUNAL'S PARTIAL AWARD*

On June 1, 2010, the AAA Tribunal entered a partial award that dismissed a number of the Standard Chartered affiliates and employees, leaving only Standard Chartered and StanChart as respondents. (*See* Berarducci Decl., Ex. M ("Partial Award").) The Partial Award also determined that StanChart was properly before the AAA Tribunal and that a consolidated proceeding was proper. In addition, the Partial Award noted an issue for later resolution as to whether it had jurisdiction over certain purchases of Fairfield Sentry securities that occurred through accounts at Standard Chartered Bank (Switzerland) SA.

Though StanChart argued that the AAA Tribunal had no jurisdiction over it because the StanChart Brokerage Agreements provided for FINRA arbitration, the Partial Award found that jurisdiction was proper over StanChart under successor liability and estoppel theories. The Partial Award noted that StanChart is a successor to Standard Chartered because it "derived direct benefits from the [Standard Chartered] Brokerage Agreement[s] and the brokerage relationship[s] pursued thereunder." (Partial Award at 12.) This finding was grounded on the letters sent by Standard Chartered in October 2008 noting that Defendants' accounts were being transferred to StanChart, (see Berarducci Decl., Ex. F), and did not turn on whether securities had actually been transferred. (See Partial Award at 12–13.) Accordingly, StanChart was bound by the Standard Chartered Brokerage Agreement providing for AAA arbitration.

The Partial Award then considered the procedural and substantive unconscionability of StanChart's attempted retroactive modification of the agreements between itself and Defendants. The Partial Award considered this argument only "in the interests of a complete analysis" and explicitly noted that "its decision [did] not turn" on unconscionability considerations. (Id. at 13.) The AAA Tribunal found that the retroactive amendment—substituting FINRA arbitration for AAA arbitration— was both procedurally and substantively unconscionable. According to the AAA Tribunal, the amendment was procedurally unconscionable because StanChart did not show that any of the Defendants received "actual notice of the new form brokerage agreement and the change in forum." (See id. at 14.) Though noting that StanChart referred to its "hold-mail" system, the Partial Award found "procedural unconscionability based on a failure to demonstrate that actual notice was given to the [Defendants]." (Id.) The Partial Award further noted that any waiver of a right to actual notice pursuant to the NISA's "hold mail" provisions was similarly unconscionable because it characterized the change from AAA arbitration to FINRA arbitration as a "significant right" because FINRA arbitration was more favorable to StanChart. (See id. at 14 n. 6.)

The AAA Tribunal concluded that the retroactive change was substantively unconscionable for two reasons. First, Defendants "would be required to pursue their claims against StanChart and [Standard Chartered] in two different forums with respect to the same transaction and the same claims." (Id. at 14.) "Requiring pursuit in two forums for the same claim by means of the substitution of a new form contract, which mandates arbitration in a different forum against a successor entity, here owned by the same ultimate parent, is sufficient to require a finding of unconscionability." (Id.) Next, in addition to this general unfairness of unnecessarily increasing litigation expenses, the Partial Award noted that, based on the specific facts of Defendants' claims, Defendants would be "whipsawed and subject to conflicted rulings ... defenses have been suggested and may be asserted in the two separate forums with these two institutional respondents [of StanChart and Standard Chartered] each defending by contending that the other is the one potentially liable." (Id. at 15.) Such a result was "so outrageous as to warrant holding ... the unilateral substitution of a new forum in the new agreement unenforceable on the ground of substantive unconscionability alone." (Id. (brackets omitted).) In sum, this case presented "exceptional circumstances." (Id.)

As for the consolidation question, the Partial Award first "explored ... whether there is really a question of consolidation at all." (Id.) Since the arbitration was filed jointly in the first instance and was

not a consolidation of separately filed arbitrations, each at different stages of adjudication and thus presenting complications and delays arising from coordination, the situation was "more akin to a joinder." (*Id.* at 16.) Allowing the arbitration to proceed as filed would be "more expeditious and cost effective" because it presented "claims arising out of the same series or occurrences and present[ed] questions of law and fact common to all parties." (*Id.*) Plaintiffs also did not identify any prejudice they would suffer if the arbitration proceeded as filed. (*See id.*)

The Partial Award then, citing the United States Supreme Court's recent decision in *Stolt–Nielsen S.A. v. AnimalFeeds International Corp.,* —— U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), considered whether the arbitration agreement itself resolved the issue. (*See id.*) The Partial Award further noted that federal circuit courts universally held that "the issue of consolidation ... is a 'procedural' question and therefore for the arbitrator rather a court to decide." (*Id.*) (citing cases from the First, Third and Seventh Circuits.) Such a conclusion was not diminished by *Stolt–Nielsen S.A.'*s holding because, compared to the class action arbitration considered there, consolidation here was "a very different animal." (*Id.* at 17.)

The Partial Award then considered that both the Standard Chartered Brokerage Agreements and the StanChart Brokerage Agreements forbid class action arbitration but did not mention consolidated arbitration. The class action ban did not also ban consolidation because the latter is a "radically different process[ ]." (*Id.*) This conclusion was almost self-evident: while a class action is predicated on a class so numerous as to make joinder of all members impracticable, consolidation groups all parties precisely. (*See id.* at 17–18.) Additionally, *Stolt–Nielsen S.A.'s* concerns regarding class actions—the hundreds to thousands of parties involved, the difficulty of enforcing confidentiality, and the difficulty of determining the rights of absent class members-are simply not present in a consolidated proceeding. (*See id.* at 18.) Indeed, in this specific case, "only 24 accounts are involved, the confidentiality available in arbitration is present, [Plaintiffs] can confront and cross-examine every [Defendant] if they choose, and no [Defendant] is 'absent' as each will have to submit his or her individual proof—a far cry from class arbitration." (*Id.*)

These differences between class and consolidated arbitration led the Partial Award to conclude that the agreements in question were "ambiguous." (*Id.* at 19.) The Partial Award then, following the teaching of *Stolt–Nielsen S.A.,* considered industry custom and applicable law in interpreting the ambiguity. (*See id.*) The Partial Award did "not base its decision on any policy consideration but rather on basic contract interpretation principles for contracts governed by New York and Florida law." (*Id.*) As evidence of brokerage industry custom, the Partial Award considered FINRA rules, which "govern disputes concerning broker-dealers expressly" and which effectively allowed for consolidation. (*Id.* at 19–20.) Given this industry usage, the Partial Award construed the ambiguity against the drafters to conclude that Plaintiffs "could have specifically referred to the exclusion of multi-party forms other than class actions if that had been their intent in the face of common industry practice for broker-dealers." (*Id.* at 20.)

The Partial Award also considered New York state court decisions and noted "courts have long had and continue to have discretion to consolidate arbitrations even absent express agreement to allow it in the arbitration agreement." (*Id.* at 20–21.)

Finally, the Partial Award considered two other arguments made by Plaintiffs

against consolidation: first, that AAA rules forbid class action proceedings without a court order "where the underlying agreement prohibits class claims, consolidation or joinder." (*Id.* at 21.) This consideration was not relevant as that "AAA Policy sp[oke] to class arbitration, [having] no occasion ... to refer to consolidation and joinder." (*Id.*) Next, Plaintiffs argued that arbitration language in the NISA which provided for arbitration for "all controversies" arising out of the agreement, investment accounts, transactions, "or any other matter" meant that analogous but narrower language in the Standard Chartered Brokerage Agreement-providing for arbitration "arising out of, or relating to" similar disputes-precluded consolidation. (*Id.* at 22.) The Partial Award found that "the arbitration as filed in a multi-party fashion is fully consistent with this language [from the Standard Chartered Brokerage Agreements]." (*Id.*)

## G. *PROCEEDINGS IN THIS COURT*

Two weeks after the Partial Award was issued, Plaintiffs filed the instant lawsuit, requesting declaratory and injunctive relief (1) preventing the AAA panel from exercising jurisdiction over StanChart, (2) disallowing a consolidated proceeding in the AAA arbitration, and (3) staying all discovery in the AAA arbitration until the PSLRA stay is lifted in the similar cases pending in this Court.

On June 16, 2010, a day after the lawsuit was filed, the parties each signed a confidentiality order covering discovery for the AAA arbitration. One week later, the AAA Tribunal stayed the beginning of document production in the arbitration until July 13, 2010, so that Plaintiffs could make an application to this Court for emergency injunctive relief. The start date for document production was later delayed to July 29, 2010. On July 14, 2010, Plaintiffs moved the Court for a temporary restraining order and preliminary injunction, re-

questing a decision by July 29, 2010. Defendants filed opposition papers on July 21, 2010. By Order dated July 23, 2010, the Court denied Plaintiffs' motion and indicated that a full decision would follow separately.

## II. *LEGAL STANDARD*

■ Temporary restraining orders and preliminary injunctions are among "the most drastic tools in the arsenal of judicial remedies," and must be used with great care. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).

■ To obtain a preliminary injunction, the moving party must demonstrate "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair grounds for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, L.L.C. v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir.2004) (quotation marks omitted); *see also Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F.Supp.2d 577, 580 (S.D.N.Y.2002) (standard for temporary restraining order is the same as for a preliminary injunction). "These elements must be established by a preponderance of the evidence." *Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*, No. 08 Civ. 2152, 2008 WL 759353, at *4 (S.D.N.Y. Mar. 20, 2008).

## III. *DISCUSSION*

Plaintiffs ask this Court to order three separate forms of relief: (1) that StanChart is not subject to arbitration before a AAA panel, (2) that arbitration before the AAA panel cannot move forward in a joined or consolidated proceeding, and (3) that all discovery in the AAA arbitration

be stayed until the PSLRA stay over similar cases pending before this Court is resolved. The Court will consider each request in turn.

## A. *AAA ARBITRATION*

### 1. *Irreparable Harm*

█ StanChart argues that undergoing arbitration in front of the AAA Tribunal is per se irreparable harm because it agreed only to FINRA arbitration. Though "the Second Circuit has held that a party forced to arbitrate a dispute that is beyond the purview of the arbitration agreement suffers irreparable harm," *see Barrack, Rodos & Bacine,* 2008 WL 759353, at *5 (*citing Merrill Lynch Inv. Managers v. Optibase Ltd.,* 337 F.3d 125, 129 (2d Cir. 2003)), that rule is based on "a party being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Merrill Lynch Inv. Managers,* 337 F.3d at 129 (quotation marks omitted).

The question here is not whether the dispute between StanChart and Defendants is arbitrable-the parties agree that it is—but what arbitral panel has jurisdiction over the dispute. No matter which tribunal exercises jurisdiction, StanChart will spend time and resources in arbitration, whether the arbitration is empaneled by the AAA or FINRA. Though StanChart argues that being forced to appear before the AAA instead of FINRA is equivalent to being forced to arbitrate a dispute that should not be subject to arbitration at all, it cites no case standing squarely for this proposition. The Court, however, need not resolve whether StanChart's equivalence is true because, as will be shown below, even assuming that StanChart has sufficiently proved irreparable harm, it is not likely to prevail on the merits of its claim that the retroactive imposition of a new arbitration forum was valid. Therefore, the Court will assume for the sake of argument that StanChart satisfies the irreparable harm requirement.

### 2. *Likelihood of Success on the Merits*

█ Threshold questions about a dispute's arbitrability are subject to independent review by the courts and no deference is due to an arbitral panel's finding on the matter unless the parties "clearly agree to submit the question of arbitrability to arbitration." *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 947, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *see also Rent–A–Center, West, Inc. v. Jackson* — U.S. ——, 130 S.Ct. 2772, 2777 n. 1, 177 L.Ed.2d 403 (2010). Though Defendants suggest here that StanChart, by submitting this question to the AAA Tribunal, has waived its right to this Court's independent review of the AAA Tribunal's jurisdiction, "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.,* a willingness to be effectively bound by the arbitrator's decision on that point." *Id.* at 946, 115 S.Ct. 1920.

As noted, this case is distinct from those considering whether a particular dispute is subject to arbitration at all. The question presented here is not whether Defendants' disputes with StanChart are arbitrable—they clearly are—but about which arbitration tribunal should have adjudicative power over the disputes. Though StanChart argues that the choice of specific arbitral forum is a threshold question, it overstates the import of the cases it cites in support. *See Luckie v. Smith Barney, Harris Upham & Co., Inc.,* 999 F.2d 509 (11th Cir. 1993) (per curiam); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis,* 903 F.2d 109 (2d Cir.1990). These cases considered arbitration terms in conflicting contracts, not whether a difference in arbitral forum was a threshold question of arbitrability. *See also Howsam v. Dean*

*Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (cataloging disputes that concern arbitrability).

The Court need not resolve whether this question is a pure one of arbitrability because, even giving no deference to the Partial Award and reviewing the arbitrability question independently, the Court cannot find that StanChart has carried its burden to obtain a preliminary injunction forbidding AAA arbitration.

Given that StanChart unquestionably assumed the Standard Chartered Brokerage Agreements, and thus became bound to AAA arbitration at least until the Retroactive Letter, StanChart's position is that it successfully modified the Standard Chartered Brokerage Agreements by replacing them with the StanChart Brokerage Agreements that provide for FINRA arbitration. After review of the submissions by the parties, the Court is not persuaded that StanChart has shown it is likely to succeed on the merits of this claim.

First, though the parties seemingly assume that retroactive amendments are proper in some circumstances, the Court is not so persuaded. The plain language of the clause in the Standard Chartered Brokerage Agreements that StanChart concedes controls their attempted amendment contemplates that amendments "shall be effective as of a date to be established by [StanChart]." (Standard Chartered Brokerage Agreement ¶ 8.) By using the future tensed "shall," this language seems to limit amendments to those occurring in the future. *See Black's Law Dictionary* 1407 (8th ed. 2004). Contracts that allow for retroactive amendment do not use such ambiguous language. *See, e.g., Cogan v. Phoenix Life Ins. Co.*, 310 F.3d 238, 240 (1st Cir.2002) ("The Company shall have the right to amend this Plan at any time and from time to time, including a retroactive amendment. Any such amendment shall become effective upon the date stated

therein...."); *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1378 (6th Cir.1994) ("The Board of Directors reserves the right at any time and from time to time, and retroactively if deemed necessary or appropriate, to amend in whole or in part any or all of the provisions of the Plan....")· This interpretation is supported by the evidence of past practice currently before the Court: when Standard Chartered sent notice in October 2008 of its transfer of accounts to StanChart and modified the law governing the Standard Chartered Brokerage Agreements, that amendment became effective more than a month after the letter was sent. (*See* Berarducci Decl., Ex. F.) StanChart simply assumes retroactive amendments are proper and makes no effort to justify an interpretation of ¶ 8 of the Standard Chartered Brokerage Agreement that allows for them.

Next, even assuming that retroactive amendments were allowed in this instance, ¶ 8 provides that Defendants' "use of the Account after delivery of notice of the change constitutes [Defendant's] agreement to be bound thereby." (Standard Chartered Brokerage Agreement ¶ 8.) StanChart has presented no evidence that even a single Defendant "use[d]" a StanChart account after receipt of the Retroactive Letter.

Further, ¶ 8 provided Standard Chartered "the right to amend this agreement by modifying or rescinding any of its existing provisions or by adding any new provision." (*Id.*) StanChart did not simply add, modify or rescind a "provision"—it attempted to substitute a completely new contract. (*See* Retroactive Letter ("The enclosed [StanChart Brokerage Agreement] ... replace[es] any previous version of that agreement.").)

Additionally, StanChart has made no attempt to explain why the NISAs do not control this issue. The NISAs allow only

for prospective amendments. (*See* NISA ¶ 9(c) ("amendments and changes shall take effect ... 30 days after the date on which such notice is mailed or on any later date specified in such notice.").) They also provide that NISA provisions control in the event of any conflict between the NISAs and other agreements. (*See id.* ¶ 9(e).) StanChart does not address why the NISA's terms concerning amendments-which appear to conflict with the Standard Chartered Brokerage Agreements-are not controlling.

■■■ Finally, even if the above concerns were satisfied, the Court is not persuaded that StanChart has successfully settled questions concerning the amendment's unconscionability. "A contract may be void for unconscionability in New York when it is so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms." *U.S. Underwriters Ins. Co. v. Landau,* 679 F.Supp.2d 330, 340 (E.D.N.Y.2010) (quotation marks omitted). Unconscionability comes in two varieties: procedural and substantive. To determine procedural unconscionability, "courts examine whether there is a lack of meaningful choice for a party." *Id.* (quotation marks omitted). "Substantive unconscionability" considers "whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Id.* (quotation marks omitted).

The circumstances of this case present significant concerns implicating both procedural and substantive unconscionability. Procedurally, Defendants were essentially presented with a contract of adhesion that they were bound by as soon as they used

their accounts. However, as the Partial Award noted, StanChart has presented no evidence that Defendants received actual notice of the amendment. Plaintiffs argue that Defendants were bound by the amendment even if they had not received actual notice of the amendments as the Standard Chartered Brokerage Agreements provide that communications merely "mailed"—not actually received—"shall be deemed to have been personally delivered" to Defendants. (Standard Chartered Brokerage Agreement ¶ 7.) These circumstances raise serious questions as to whether the imposition of a new arbitral panel clause in the StanChart Brokerage Agreements was procedurally unconscionable.

Substantively, the StanChart FINRA amendment was a lopsided, unilaterally-imposed change to the agreements between StanChart and Defendants that benefitted only StanChart. In addition to a consensus among the parties that FINRA is a more favorable forum of adjudication for broker-dealers such as StanChart, Plaintiffs' election to amend only the agreements between StanChart and Defendants and not the agreements between Standard Chartered and Defendants evinces a divide-and-conquer mentality of sapping Defendants' resources by forcing them to arbitrate identical disputes simultaneously in two different forums.

Accordingly, due to the large number of unresolved issues surrounding the retroactive modification of the contracts between StanChart and Defendants, the Court finds that StanChart has failed to prove it is more likely than not to prevail in showing that StanChart is not subject to arbitration before a AAA panel.[5]

---

5. Additionally, StanChart completely fails to address arguments that it is bound under the Standard Chartered Brokerage Agreements (and thus AAA arbitration) on theories of estoppel or successor liability. This constituted

the primary ground on which the Partial Award rested the AAA Tribunal's jurisdiction. The Court notes that the background of this case presents at least a prima facie case of successor liability and estoppel. StanChart

### 3. *Balance of Hardships and Serious Questions*

Based on the preceding discussion, the Court further finds that StanChart has failed to show serious questions as to the merits and a balance of the hardships tipping decidedly in its favor.

### B. *CONSOLIDATED PROCEEDING*

#### 1. *Irreparable Harm*

■ Plaintiffs' sole argument about irreparable harm relating to a consolidated proceeding is that they should not be subject to the expense or burden of participating in an arbitration that has been consolidated. Such tautological protestations are not sufficient to sustain their burden. *See Litho Prestige, Div. of Unimedia Grp., Inc. v. News Am. Pub.*, 652 F.Supp. 804, 808 (S.D.N.Y.1986) (finding that "[c]onclusory statements" are "an insufficient basis for a finding of irreparable harm."). Plaintiffs' arguments are also undercut by their insistence that StanChart is subject to arbitration in front of a FINRA panel. FINRA rules provide for consolidated proceedings and it is thus disingenuous for Plaintiffs to argue on one hand that only FINRA may exercise jurisdiction over StanChart but that one of FINRA's rules likely to be used if arbitration begins there would also wreak irreparable harm on Plaintiffs. The Court also notes that this arbitration was commenced in its present form approximately nine months before Plaintiffs initiated proceedings in this Court, a delay that undercuts the urgency of their request for emergency relief.

Accordingly, as a showing of irreparable harm is the "single most important prerequisite" for issuance of a preliminary injunction, *Verzani v. Costco Wholesale Corp.*, No. 09–3770–cv, 387 Fed.Appx. 50, 51, 2010 WL 2838526, at *1 (2d Cir. July 21, 2010) (quotation marks omitted), Plaintiffs' motion loses on this ground alone.

#### 2. *Likelihood of Success on the Merits*

■ Unlike threshold questions of arbitrability, "procedural questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide." *Stolt–Nielsen S.A.*, 130 S.Ct. at 1775; *see also John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). Though parties to an arbitration may seek vacatur of an arbitral panel's award on a procedural question, in doing so "[i] t is not enough for [Plaintiffs] to show that the panel committed an error-or even a serious error." *Id.* at 1767. Instead, an arbitral panel's decision will only be reversed if the panel has "exceed[ed] their powers." 9 U.S.C. § 10(a)(4).

Federal courts generally consider consolidation to be a question of procedure. Though the Second Circuit has held that "federal district courts do not have the power to order consolidation of two or more arbitration proceedings unless doing

---

was created for the sole purpose of assuming accounts created at Standard Chartered that were required to be transferred, pursuant to the Gramm–Leach–Bliley Act. The November 2008 transfer date has passed, and though StanChart asserts that the transfer from Standard Chartered is not completed, they offer scant supporting material that counters the logical inference that the transfer, planned by a sophisticated financial entity and required by law, did occur as scheduled. Even if the

transfer was not fully completed, StanChart has derived benefits from those assets that were transferred. *See Ryan, Beck & Co., LLC v. Fakih*, 268 F.Supp.2d 210, 219–20 (E.D.N.Y.2003) ("Having taken over [certain] accounts, assets and customer relationships, subject to the protections afforded the firm by the Client Agreements, [plaintiff] thereby derived direct benefits and is estopped from avoiding the duties imposed by the arbitration provisions contained in those agreements.").

so would be in accordance with the terms of [an] agreement or agreements among the parties," *Glencore Ltd. v. Schnitzer Steel Products, Co.*, 189 F.3d 264, 266 (2d Cir.1999) (quotation marks omitted), the Circuit Court has not opined on the standard of review a district court is to employ when reviewing an arbitration proceeding that was originally filed in a consolidated fashion and that has been approved by the arbitral tribunal. Three other federal circuits have expressly held that questions of consolidation are procedural, *see Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co.*, 489 F.3d 580, 585–87 (3d Cir.2007); *Employers Ins. Co. of Wausau v. Century Indem. Co.*, 443 F.3d 573, 576–78 (7th Cir.2006); *Shaw's Supermarkets, Inc. v. United Food & Commercial Workers Union, Local 791, AFL–CIO*, 321 F.3d 251, 254 (1st Cir.2003), as has a court in this District. *See Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F.Supp.2d 469, 471–74 (S.D.N.Y.2005).

For the purposes of evaluating a motion for a preliminary injunction, the Court finds persuasive the cases holding that questions of consolidation are procedural. The Partial Award therefore may be vacated only if the arbitrators have "exceed[ed] their powers." 9 U.S.C. § 10(a)(4). Here, the AAA Tribunal did not simply "dispense[ ][its] own brand of industrial justice" or deploy its own policy instincts, *Stolt–Nielsen S.A.*, 130 S.Ct. at 1765 (quotation marks omitted), but instead followed well-settled rules of law concerning the construction of contracts. The Partial Award, finding that the relevant contract was ambiguous as to whether consolidated proceedings were allowed, consulted both custom in the broker-dealer industry in the form of FINRA rules and New York law, which governs the contract. (*See id.* at 19–21 (*citing John W. Cowper Co., Inc. v. Hires–Turner Glass Co.*, 51 N.Y.2d 937, 434 N.Y.S.2d 987, 415 N.E.2d 975 (1980); *Yaffe v. Mintz & Fraade, P.C.*, 270 A.D.2d

43, 704 N.Y.S.2d 467 (1st Dep't 2000); *Gershen v. Hess*, 163 A.D.2d 17, 558 N.Y.S.2d 14 (1st Dep't 1990))); *see also* Rule 12312 of the FINRA Code of Arbitration Procedure for Customer Dispute; Rule 13312 of the FINRA Code of Arbitration Procedure for Industry Dispute.

The recent United States Supreme Court decision in *Stolt–Nielsen S.A.* does not compel a contrary result. *See* 130 S.Ct. at 1758. There, the Court found that a contract that was silent as to class arbitration did not allow class arbitration. In reaching this result, *Stolt–Nielsen S.A.* considered that "class action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it simply by agreeing to submit their disputes to an arbitrator." *Id.* at 1775. The Court reasoned that the following "fundamental changes" wrought by a class action proceeding required special attention: (1) a class can number in the hundreds or thousands, (2) usual presumptions of privacy and confidentiality in arbitration do not apply, (3) absent parties are bound by the panel's determinations, and (4) the commercial stakes are higher. *Id.* at 1776.

None of these concerns apply to the consolidated proceeding at issue here: (1) only twenty-four investment accounts held by thirty-eight parties are at stake in the arbitration, (2) the usual rules of privacy and confidentiality apply, (3) no parties are absent, and (4) Plaintiffs' liability (if they are held liable) will be the same whether awards are parceled out piecemeal or decided in one proceeding. Unlike the differences between bilateral and class arbitration, the differences between the limited consolidation here and bilateral arbitration are not so great. The Court also notes that, as the Partial Award pointed out, this case was initially brought by Defendants in one proceeding and therefore does not

present a consolidation of disparate matters at various stages of adjudication such that coordinating them will be inconvenient or burdensome.

Accordingly, the Court finds that Plaintiffs have not shown by a preponderance of the evidence that they are likely to prove the AAA Tribunal exceeded its power in allowing the arbitration to proceed in a consolidated fashion as originally filed.

3. *Balance of Hardships and Serious Questions*

As the Court has found that Plaintiffs have not sufficiently shown that they will be irreparably harmed if the arbitration proceeds in a consolidated fashion, and that they have raised no real question as to whether the AAA Tribunal exceeded its powers on this point, the Court finds that the Plaintiffs have failed to show serious questions going to the merits or a balance of the hardships tipping decidedly in their favor.

## C. STAY OF DISCOVERY IN ARBITRATION

1. *Irreparable Harm*

■■■ Plaintiffs argue that the stay over discovery applicable to the cases consolidated into *Anwar,* imposed under the PSLRA, requires that discovery in any related arbitration can also not proceed. Therefore, Plaintiffs contend, the document production schedule established by the AAA Tribunal is an undue burden that irreparably harms Plaintiffs. As noted, such generic allegations of irreparable harm are not sufficient to require injunctive relief. *See Litho Prestige, Div. of Unimedia Grp., Inc.,* 652 F.Supp. at 808.

2. *Likelihood of Success on the Merits*

As the AAA Tribunal has ruled against Plaintiffs on their request to stay discovery in the arbitration, this determination

of a procedural issue must be given significant deference. *See* 9 U.S.C. § 10(a)(4).

The Court finds Plaintiffs' argument in support of a stay of discovery in the arbitration to be without merit. The stay of discovery empowered by PSLRA applies only to proceedings in federal court. *See* 15 U.S.C. § 78u–4(b)(3)(B); *In re Regions Morgan Keegan Sec.,* Nos. 07–02830, MDL 2009, 2010 WL 596444, at *2 (W.D.Tenn. Feb. 16, 2010). In order to address attempts to bypass PSLRA by using state law fraud actions, the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") was enacted, *see Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 82, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006), which extended the reach of PSLRA's discovery stay to state court proceedings. *See* 15 U.S.C. § 78u–4(b)(3)(D). Neither PSLRA or SLUSA contemplates arbitrations. Therefore the Court is not persuaded that Plaintiffs will ultimately prevail in showing that PSLRA allows the Court to micro-manage arbitration proceedings.

The Court also notes that even if all of the motions to dismiss pending in *Anwar* were granted, and thus no discovery ever occurred in federal court, this would not bar document production in the arbitration. Plaintiffs have also not suggested how confidentiality provisions that are in place in the arbitration will not prevent any improper sharing or usage of material obtained in the arbitration's discovery.

In addition. Plaintiffs' invocation of the All Writs Act, 28 U.S.C. § 1651, is baseless. Another Court in this District recently rejected a similar request to stay arbitration on the grounds that the arbitration would impose hardship on the defendant and "impair [the] Court's flexibility" by raising possible issues of collateral estoppel. *In re Lehman Bros. Sec. and ERISA Litig.,* 706 F.Supp.2d 552, 553–55, 561–62 (S.D.N.Y.2010). Though the All

Writs Act "fills the interstices of federal judicial powers, authorizing courts to issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained," the court saw no reason to enjoin arbitration and its concomitant document production. *Id.* at 561–62 (quotation marks omitted). This Court is persuaded that *Lehman Bros.'*s holding is equally applicable to the current circumstances and notes that Plaintiffs' argument is supported largely by conclusory allegations concerning the burden imposed by document production. *See id.* (noting that defendant made "few non-conclusory arguments" in support of staying arbitration).

Finally, the Court notes that arbitration is a matter of contract. If Plaintiffs had not wanted to be subject to the demands of arbitration, they could have left all protection of their interests to the courts. But Plaintiffs did choose arbitration, and now that they have, they cannot shield themselves with rules governing federal lawsuits.

Accordingly, the Court finds that Plaintiffs have not shown they are likely to succeed on the merits of placing a stay on discovery in already-commenced arbitration.

3. *Balance of Hardships and Serious Questions*

As Plaintiffs' arguments on the merits is unavailing and they have failed to show any real harm, the Court finds that Plaintiffs have failed to show there are serious questions going to the merits or a balance of hardships tipping decidedly in their favor.

### IV. *ORDER*

Accordingly, it is hereby

**ORDERED** that the Court's Order dated July 23, 2010 herein is amended to incorporate the discussion set forth above; and it is further

**ORDERED** that the motion of plaintiffs Standard Chartered Bank International (Americas) Limited and StanChart Securities International, Inc. for a Temporary Restraining Order and For Preliminary Injunction (Docket No. 485) is DENIED; and it is finally.

**ORDERED** that the parties are directed to confer and prepare a proposed Case Management Plan to be submitted in the form provided by the Court, for the Court's review and approval at an initial conference scheduled for September 10, 2010 at 1:45 p.m.

**SO ORDERED.**