Pasha S. ANWAR, et al., Plaintiffs,

v.

**FAIRFIELD GREENWICH LIMITED,**
et al., Defendants.

Nos. 09 Civ. 0118, 09 Civ. 8500, 10 Civ.
0918, 10 Civ. 0919, 10 Civ. 0920.

United States District Court,
S.D. New York.

Oct. 4, 2010.

David A. Barrett, Boies, Schiller & Flexner, LLP, Christopher Lovell, Victor E. Stewart, Jody Krisiloff, Lovell Stewart Halebian Jacobson LLP, James Abram Harrod, III, Carl Lester Stine, Chet Barry Waldman, Robert Craig Finkel, Wolf Popper LLP, Robert Alan Wallner, Jean Lee, Kent Andrew Bronson, Kristi Stahnke McGregor, Milberg LLP, William M. O'Connor, Crowell & Moring LLP, Brian Dale Graifman, David Alan Gehn, Gusrae, Kaplan, Bruno & Nusbaum, PLLC, Catherine A. Torrell, Cohen Milstein Sellers & Toll P.L.L.C., Daniel W. Krasner, Demet Basar, Gregory Mark Nespole, Wolf Haldenstein Adler Freeman & Herz LLP, David Robert Kromm, Hillary Sobel, Jeffrey Charles Zwerling, Robert S. Schachter, Stephanie Elizabeth Kirwan, Stephen Leland Brodsky, Richard A. Speirs, Zwerling, Schachter & Zwerling, Joseph Emanuel Neuhaus, Sullivan and Cromwell, LLP, New York, NY, Sashi Bach Boruchow, Stuart Harold Singer, Boies, Schiller & Flexner LLP, Fort Lauderdale, FL, Matthew W. Cheney, Crowell & Moring LLP, Daniel S. Sommers, Joshua Seth Devore, Steven Jeffrey Toll, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Paul Edouard Dans, Rivero Mestre & Castro, Jeffrey F.D. Bogert, Bogert & Rembold, P.L., Laurence Edward Curran, III, Curran & Associates, Coral Gables, FL, David Alan Rothstein, Jeffrey Brett Kaplan, Lorenz Michel Pruss, Dimond Kaplan & Rothstein, Coconut Grove, FL, Robert E. Linkin, Dimond Kaplan & Rothstein, PA, Richard E. Brodsky, The Brodsky Law Firm, Miami, FL, Michael Jules Aguirre, Aguirre, Morris & Severson LLP, San Diego, CA, for Plaintiffs.

Mark Geoffrey Cunha, Michael Joseph Chepiga, Paige Elizabeth Fleming, Paul Jacob Sirkis, Peter Eric Kazanoff, Sara Ann Ricciardi, Mark Geoffrey Cunha, Simpson Thacher & Bartlett LLP, Glenn Kurtz, White & Case LLP, Andrew J. Levander, David Scott Hoffner, Dechert, LLP, Adam K. Grant, Daniel R. Benson, Daniel J. Fetterman, Marc E. Kasowitz, Kasowitz, Benson, Torres & Friedman, LLP, Helen Virginia Cantwell, Mark P. Goodman, Debevoise & Plimpton, Eliot Lauer, Michael Joseph Moscato, Timothy Neil McCabe, Curtis, Mallet–Prevost, Colt & Mosle, LLP, Andrew M. Genser, Kirkland & Ellis LLP, Gabrielle Sean Marshall, Sarah Loomis Cave, William R. Maguire, Hughes Hubbard & Reed LLP, Stephen Lee Weinstein, Eiseman, Levine, Lehrhaupt & Kakoyiannis, P.C., Edward M. Spiro, Robert James Anello, Claudio Godinez Roumainochoa, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., Jonathan David Cogan, Michael San-

gyun Kim, Kobre & Kim LLP, Sharon L. Nelles, Allison Caffarone, Bradley Paul Smith, Patrick Barrett Berarducci, Sullivan & Cromwell, LLP, New York, NY, Jennie Boehm Krasner, Dechert, LLP, Princeton, NJ, Amanda McGovern, Dyanne Eyce Feinberg, Elizabeth A. Izquierdo, Lewis Nathan Brown, Terence Michael Mullen, Gilbride Heller & Brown P.A., Hilarie Bass, Ricardo A. Gonzalez, Greenberg Traurig, Miami, FL, Amy E. Crawford, Brenton Rogers, Emily Nicklin, Timothy A. Duffy, Kirkland & Ellis LLP, Chicago, IL, Diane Lee McGimsey, Sullivan and Cromwell LLP, Los Angeles, CA, Bruce Allen Baird, Covington & Burling, L.L.P., Washington, DC, for Defendants.

David J. Molton, Martin S. Siegel, Brown Rudnick LLP, for Plaintiffs, Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

The matter at hand arises from four separately-filed actions chiefly alleging that defendant Standard Chartered Bank International (Americas) Ltd. ("SCBI") committed a number of wrongful acts under federal and/or state law by recommending that six non-United States resident entities or individuals ("Plaintiffs") invest in two feeder funds that were in turn invested in Bernard Madoff's ("Madoff") Ponzi scheme.

SCBI and its corporate affiliates ("Defendants") now move to dismiss under Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") and 9(b) ("Rule 9(b)"). By Order dated September 29, 2010, the Court denied Defendants' motion in part and granted it in part. The Court now sets forth its findings, reasoning, and conclusions.

## I. BACKGROUND

Plaintiffs in these cases [1] have filed four complaints: Headway Investment Corporation ("Headway"), a corporation organized under the laws of the Republic of Panama, filed a Complaint on April 6, 2009 ("Headway Complaint"); Maria Akriby Valladolid ("Valladolid") filed a First Amended Complaint on September 4, 2009 ("Valladolid Complaint"); Ricardo Lopez ("Lopez"), a resident of Spain, filed a First Amended Complaint on October 12, 2009 ("Lopez Complaint"); Maridom Ltd. ("Maridom"), a corporation organized under the laws of the Bahamas, Caribetrans, S.A., ("Caribetrans") a corporation organized under the laws of the Dominican Republic, and Abbot Capital, Inc. ("Abbot") (together with Maridom and Caribetrans, "Maridom Plaintiffs"), a corporation organized under the laws of the Republic of Panama, filed an Amended Complaint on October 13, 2009 ("Maridom Complaint") (with the Headway Complaint, Valladolid Complaint and Lopez Complaint, "Complaints"). Unless otherwise noted, the factual recitation below is drawn solely from the Complaints. The Complaints are not entirely consistent with each other, and certain of Plaintiffs' allegations are specific to individual Plaintiffs. These differences will, as necessary, be explored below.

Plaintiffs invested in two feeder funds operated by the Fairfield Greenwich Group ("FGG"). These funds, Fairfield Sentry Ltd. ("Fairfield Sentry") and Fairfield Sigma Ltd. ("Fairfield Sigma") (with Fairfield Sentry, "Fairfield Funds"), were in turn invested in Bernard L. Madoff Investment Securities, a now-notorious Ponzi scheme. The money invested in the

---

**1.** Pursuant to the Order of the Judicial Panel on Multidistrict Litigation issued in MDL No. 2088, this case has been consolidated into a number of other lawsuits concerning the fallout of Bernard Madoff's Ponzi scheme.

Fairfield Funds was purportedly invested via a money-making scheme known as the "split-strike conversion" method.

Between January 2003 and September 2008, Plaintiffs, at SCBI's recommendation and strong urging, invested various amounts of money in the Fairfield Funds. Plaintiffs contend that SCBI recommended these investments without having conducted any investigation into the Fairfield Funds. All Plaintiffs save Lopez allege an extensive array of so-called "red flags"— ranging from the impossibility of Madoff's returns to other financial firms refusing to invest with Madoff—that should have alerted Defendants to infirmities in the Fairfield Funds. By making investment recommendations in these circumstances, Plaintiffs allege, Defendants violated a number of duties owed to Plaintiffs.

Plaintiffs' relationship with Defendants began by opening accounts at American Express Bank International ("AEBI") between 1991 and 2006.[2] In February 2008, AEBI was acquired by Standard Chartered PLC and renamed SCBI. SCBI is a so-called Edge Act corporation, see 12 U.S.C. § 611; *Miranda de Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351, 1352 n. 1 (11th Cir.2001), incorporated under the laws of the United States to conduct international banking business and is headquartered in Miami, Florida.[3]

At the same time AEBI was acquired, Standard Chartered PLC also acquired AEBI's parent entity, American Express Bank Ltd. ("AEBL"), and renamed it Standard Chartered International (USA) Ltd. ("SCI").[4] An intermediate entity, Standard Chartered Bank, looms between SCBI and SCI and their parent entity Standard Chartered PLC. These entities— Standard Chartered PLC, Standard Chartered Bank, SCBI and SCI—are collectively referred to as "Standard Chartered." As yet, no party has raised any issues about successor liability or other issues that prevent Standard Chartered from being held liable for investment recommendations or other activities that occurred while SCBI was AEBI or while SCI was AEBL.[5]

---

2. Facts in this and the following paragraph have been supplemented by information in Defendants' submissions, which provide clarity to Plaintiffs' sometimes conflicting accounts of Defendants' corporate structure. Plaintiffs have not disputed any of the information about Defendants' corporate structure or history and the material is largely irrelevant to substantive matters of the motion to dismiss.

3. As SCBI is alleged to be organized under the laws of the United States and this case involves international banking, subject matter jurisdiction is proper under 12 U.S.C. § 632, which provides that "all suits of a civil nature at common law ... to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, ... or out of other international or foreign financial operations, ... shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits."

4. Though the Valladolid Complaint alleges Valladolid was a customer of AEBL, and hence now SCI, she apparently now represents that she was a client of SCBI. (*See* Unified Response To Motion To Dismiss, dated May 3, 2010, at 16 ("[A]ll of the Complaints allege ... that the Plaintiffs were offshore private banking clients of Standard Chartered's Miami-based Edge Act bank, now called Standard Chartered Bank International (Americas) Ltd.").) But in the same Unified Response, Valladolid also maintains she was a customer of AEBL. (*See id.* at 22.) If Valladolid files any amended pleadings with the Court, this apparent discrepancy must be remedied.

5. Though the text of the Valladolid Complaint names American Express Bank, an entity not previously mentioned, as a defendant, (*see, e.g.*, Valladolid Complaint ¶¶ 3, 29), American Express Bank does not appear in the caption of the Valladolid Complaint and no party mentions this entity in any submission to the

The Court notes that Plaintiffs have abandoned a number of claims and defendants named in the complaints. In particular, Lopez has explicitly abandoned a claim under the Investment Advisors Act, 15 U.S.C. § 80b-1 et seq. (See Unified Response to Motions to Dismiss, dated May 3, 2010, at 20 n. 11.) Plaintiffs have also failed to argue why Headway and Valladolid's negligence claims should not be dismissed and the Court considers these negligence claims abandoned. See Burchette v. Abercrombie & Fitch Stores, No. 08 Civ. 8786, 2009 WL 856682, at *9 (S.D.N.Y. Mar. 30, 2009).

The Headway and Valladolid Complaints named individual defendants in addition to corporate entities—Carlos Gadala–Maria, Raul N. Mas, Robert Friedman, Rodolfo Pages and John G. Dutkowski for Headway and Luisa Serena ("Serena") for Valladolid (collectively, "Individual Defendants"). The Individual Defendants, by Notices of Joinder dated March 16, 2010, joined Standard Chartered's motion to dismiss. However—save for a fleeting mention of Serena, who was based in California, to support an argument that California state law should apply to Valladolid's claims—Plaintiffs, in their memorandum of law opposing Standard Chartered's motion to dismiss, make no argument in support of the claims against the Individual Defendants. Plaintiffs' opposition to Standard Chartered's motion frames all claims as being against "Standard Chartered," which does not encompass any of the Individual

Defendants and instead only "refer[s] to Standard Chartered Bank International (Americas) Ltd., Standard Chartered Bank, Standard Chartered PLC and Standard Chartered International (USA) Ltd. And its predecessor related, or affiliated American Express Bank entities." (Unified Response to Motion to Dismiss, dated May 3, 2010 at 1 n. 3.) Accordingly, the Court considers the claims against the Individual Defendants abandoned. See id.[6]

After these modifications, the remaining causes of action break down as follows:

- Headway alleges breach of fiduciary duty and unjust enrichment against SCBI and Standard Chartered Bank;

- Valladolid alleges breach of fiduciary duty, negligence and unjust enrichment against SCBI, Standard Chartered PLC and SCI;

- Lopez alleges claims under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) ("§ 10(b)"), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, breach of fiduciary duty, gross negligence, unjust enrichment and fraud against SCBI and Standard Chartered PLC, as well as a control person claim under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("§ 20(a)"), against Standard Chartered PLC;

- Maridom Plaintiffs allege breach of fiduciary duty, negligent misrepresentation and fraud against SCBI.

Court. Apparently, American Express Bank has not been purchased by any of the Standard Chartered entities. Accordingly, the Court notes that American Express Bank is not a party to this action. See Jones v. Parmley, No. 5:98–CV–374, 2005 WL 928666, at *1 (N.D.N.Y. Apr. 20, 2005) (interpreting Fed. R.Civ.P. 10(b) and holding that "a party that is not named in the caption of an amended complaint is not a party to the action."). But see Department of Econ. Dev. v. Arthur Andersen & Co., 924 F.Supp. 449, 484 (S.D.N.Y.

1996) ("It is not absolutely necessary to list an individual in the caption of the complaint in order to name that individual as a defendant in the action.").

**6.** Defendant Samuel Perruchoud, named in the Headway Complaint, did not join the Standard Chartered motion to dismiss. However, Plaintiffs make no mention of Perruchoud in their opposition and Perruchoud is accordingly dismissed from this action.

## II. DISCUSSION

### A. LEGAL STANDARD ON A RULE 12(b)(6) MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d 566, 574 (S.D.N.Y.2005) (internal quotation marks omitted). The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

### B. DOCUMENTS CONSIDERED ON A RULE 12(b)(6) MOTION

Standard Chartered has submitted to the Court twenty-five documents related to its relationships with Plaintiffs. Plaintiffs vigorously contest the propriety of the Court considering these documents, arguing that a court ruling on a Rule 12(b)(6) motion to dismiss is limited to the facts alleged in Plaintiffs' complaints and that the documents submitted by Standard Chartered do not satisfy any of the exceptions to this general rule.

"Consideration of materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir.2006). For instance, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers*, 282 F.3d at 152 (quotation marks omitted). But "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Id.* at 153 (quotation marks omitted). In addition, "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit" may be considered. *Id.* (quotation marks omitted).

Here, Standard Chartered has submitted two categories of documents: (1) agreements between Plaintiffs and Standard Chartered and (2) Private Placement Memorandums ("Placement Memos") outlining investments in the Fairfield Funds. The Court will consider each in turn.

#### 1. Agreements

Standard Chartered has submitted individual Account Applications and Agreements ("Applications"), signed and dated by each of the Plaintiffs, (*see* Declaration of Patrick R. Berarducci, dated March 10, 2010 ("Berarducci Decl."), Exs. B–H), and a series of what it argues are representative Rules and Regulations Governing Accounts ("RRGA"), (*see* Berarducci Decl., Ex. I–J), which the Plaintiffs acknowledged receiving by signing the Applications.

Headway, Valladolid, and Lopez reference agreements with Standard Chartered in their complaints. (*See* Headway Complaint ¶ 28; Valladolid Complaint ¶ 37; Lopez Complaint ¶ 69.) Though the Mari-

dom Complaint does not explicitly refer to any agreements between the parties, it relies heavily upon the agreements' terms and effects because its core allegations— that Standard Chartered abused its relationship with the Maridom Plaintiffs—necessarily flow from the contracts creating that relationship. The Court therefore finds that all Plaintiffs relied heavily upon agreements between themselves and Standard Chartered defining their relationship.

The problem arises in considering the particular agreements submitted by Standard Chartered. Documents outside a complaint may be considered only if it is "clear that there exist no material disputed issues of fact regarding the relevance of the document[s]." *Faulkner*, 463 F.3d at 134. Here, though Standard Chartered has presented signed Applications for each Plaintiff, the RRGAs are unsigned and in no way particularized to any Plaintiff. The earliest such RRGA is dated December 2006, (*see* Berarducci Decl., Ex. I at 22), which post-dates all of Plaintiffs' Applications. In some instances, more than a decade separates the execution of the Application and this RRGA—Maridom and Caribetrans both allege beginning accounts at Standard Chartered in 1993 and 1991 respectively.

Though the December 2006 RRGA contains provisions allowing Standard Chartered to easily amend it, the Court cannot infer that the RRGA from December 2006 is identical to whatever documents Plaintiffs should have received upon executing their Applications years earlier. That conclusion is reinforced by Standard Chartered's submission of addendums to the Applications for Lopez, Abbot and Headway: if amending the RRGA could be done at Standard Chartered's unilateral whim, separately executed addendums such as these would be unnecessary. (*See* Berarducci Decl., Exs. K–M.) The Court therefore finds that there are material issues of

disputed fact concerning the relevance of the RRGAs that preclude accepting them at this stage as incorporated in the Complaints.

The situation is different for Valladolid. Valladolid executed Nondiscretionary Investment Services Agreements ("NISA"), first on June 29, 2006, two days after completing her Application, and then on September 21, 2006. (*See* Berarducci Decl., Exs. N & O.) Because these documents are all dated contemporaneously and contain Valladolid's signature, the Court finds that there are no disputed facts as to the NISAs' relevance and will consider them when deciding Standard Chartered's motion to dismiss. *See Chambers*, 282 F.3d at 154 n. 5 (noting importance of signature on agreements to be considered on a Rule 12(b)(6) motion).

### 2. *Placement Memos*

Standard Chartered also proffers Placement Memos related to the Fairfield Funds. Only the Maridom Plaintiffs allege receiving such documents, noting that "[a]t or about the time of the initial investments in [Fairfield Sentry], SCBI provided to each of [the Maridom] Plaintiffs a document entitled 'Confidential Private Placement Memorandum' . . . for the [Fairfield Sentry] shares." (Maridom Complaint ¶ 29.) Accordingly, the Court finds no colorable grounds for Standard Chartered to suggest that any Plaintiff except the Maridom Plaintiffs received the Placement Memos.

However, even this seemingly straightforward situation is complicated by Standard Chartered's proffering of two separately dated Placement Memos related to Fairfield Sentry—one dated July 1, 2003 and the other October 1, 2004. Standard Chartered further represents to the Court that there were two other pertinent versions of the Fairfield Sentry Placement

Memos: a version effective October 1, 2002 and another effective August 14, 2006. Standard Chartered has not provided the Court copies of these two bookend Placement Memos, nor does its assertion of their existence come in a sworn declaration.

Another piece of this puzzle is the initial investment dates of the Maridom Plaintiffs, which occurred in this order: Abbot on March 26, 2004; Maridom on April 26, 2006; and Caribetrans on September 26, 2008. Given the four effective dates Standard Chartered represents for the Placement Memos, one would expect Abbot to receive the July 2003 Placement Memo, Maridom to receive the October 2004 Placement Memo, and Caribetrans to receive the August 2006 Placement Memo. But Standard Chartered, through its submission of a Subscription Agreement completed on behalf of Caribetrans for its initial investment in Fairfield Sentry, (see Berarducci Decl. Ex. Q at 1), tells the Court that the October 2004 Placement Memo—not the August 2006 Placement Memo—applies to Caribetrans.

The situation grows curiouser and curiouser after the Subscription Agreements for the other two Maridom Plaintiffs are examined. See *Faulkner*, 463 F.3d at 135 (noting that a party "added to the chaos by raising yet other documents to fill in various gaps."). Unlike the Placement Memos themselves, the Maridom Plaintiffs do not allege receiving or signing the Subscription Agreements and while the Subscription Agreements for Maridom and Abbot are signed and dated, (see *id.*, Exs. S & P), Caribetrans' is signed but not dated. (*See id.*, Ex. Q.) Maridom and Caribetrans' Subscription Agreements each specify that the respective Plaintiffs received the October 2004 Placement Memos, (see *id.*, Exs. S & Q at 1), even though according to Standard Chartered a more recently effective Placement Memo existed and was dat-

ed before Caribetrans' investment in 2008. Finally, Abbot's Subscription Agreement notes only that Abbot received a Placement Memo of unspecified date. (*See id.*, Ex. P at 1.)

Unsurprisingly, differences between the various Placement Memos could be crucial. Though some of the relevant provisions in the Placement Memos are unchanged between the two versions that Standard Chartered has provided, the Placement Memos are not identical. For example, only the October 2004 Placement Memo notes that Fairfield Sentry's "broker-deal[er] . . . may effect transactions . . . with [Fairfield Sentry] as principal. This may provide such broker-dealer with the ability to use [Fairfield Sentry's] assets to enhance its securities market-making function." (Ex. X at 17, ¶ 4.) Standard Chartered relies on this assertion as part of its argument as to why the Maridom Plaintiffs' fraud and negligent misrepresentation claims should be dismissed.

To summarize: Though the Maridom Plaintiffs allege they received Placement Memos for Fairfield Sentry, they do not allege the effective date of those Memos. Standard Chartered for its part has suggested there are at least four Placement Memos that could be the ones Maridom Plaintiffs received. But the information presented by Standard Chartered shows that it is incorrect to simply assume that a Maridom Plaintiff received the Placement Memo promulgated most closely in time preceding its initial investment in Fairfield Sentry. Otherwise, Caribetrans, given its September 2008 initial investment date, should have received the August 2006 Placement Memo, not the October 2004 version.

Each document presented by Standard Chartered raises more questions than the last, and finding these documents relevant would require the Court to resolves factual

ambiguities on behalf of Standard Chartered, an anti-matter take on the balance the Federal Rules of Civil Procedure strike on a motion to dismiss. *See Chambers,* 282 F.3d at 152 (noting that on a Rule 12(b)(6) motion, court must resolve doubts and ambiguities and draw factual inferences "in the plaintiff's favor.") At best, the Court could consider the October 2004 Placement Memo regarding Maridom's and Caribetrans' claims, but even that course would be imprudent given the sinkhole of uncertainty from which the Placement Memos have emerged.

### C. *CHOICE OF LAW*

■ As noted, these cases are before the Court pursuant to an order of the Judicial Panel on Multidistrict Litigation. In such cases, "a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit." *Menowitz v. Brown,* 991 F.2d 36, 40 (2d Cir.1993); *see also Desiano v. Warner–Lambert,* 467 F.3d 85, 91 (2d Cir.2006). Accordingly, the Court will apply Second Circuit law to the federal issues in this case, including Lopez's § 10(b) and § 20(a) causes of action.

Additionally, Florida state law applies to Plaintiffs' common law claims. Three of the four complaints—Lopez, Headway and Maridom—were originally filed in Florida, where SCBI is located, and the parties are in agreement that Florida law applies to their state claims. The fourth complaint, Valladolid's, was filed in state court in California, and Valladolid contends that California state law applies to her claims because she established her relationship with Standard Chartered at an office in San Diego. However, the NISA, which governs the relationship between Valladolid and Standard Chartered, notes that Valladolid's account "shall be governed by and construed in accordance with the laws of the State of Florida." (Berarducci

Decl., Ex. O ¶ 9.) Valladolid—who is a resident of Mexico and not California—makes no persuasive argument why this provision should be disregarded. *See Nedlloyd Lines B.V. v. Superior Court,* 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148, 1151 (1992) (directing California courts to adopt "a strong policy favoring enforcement" of forum selection clauses).

### D. *FEDERAL SECURITIES FRAUD CLAIMS*

#### 1. *Section 10(b) Claim*

Lopez alleges a § 10(b) claim against SCBI. In a private action under § 10(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).

■ Even assuming that all of the other elements of his § 10(b) claim are properly alleged, Lopez's claim fails profoundly on the scienter prong. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (quotation marks omitted). For the purposes of federal securities laws, scienter may be satisfied by a showing of motive and opportunity to commit fraud or evidence of conscious recklessness. *See South Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 108–09 (2d Cir.2009). Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence." *Id.* at 109 (*quoting Novak v. Kasaks,* 216 F.3d 300, 312 (2d Cir.2000) (emphasis omitted)

(quotation marks omitted)). For example, plaintiffs adequately allege recklessness where the risk of fraud was "so obvious that the defendant must have been aware of it." *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir.2009) (quotation marks and citation omitted).

■ In sum, plaintiffs plead a strong inference of scienter where the "complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud ...; (2) engaged in deliberately illegal behavior ...; (3) knew facts or had access to information suggesting that their public statements were not accurate ...; *or* (4) failed to check information that they had a duty to monitor...." *South Cherry*, 573 F.3d at 110 (*quoting Novak*, 216 F.3d at 311) (emphasis added).

Moreover, federal securities fraud claims are subject to the pleading standards of the Private Securities Litigation Reform Act. Accordingly, Lopez must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004).

Finally, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499. In determining whether the plaintiff adequately pleads scienter, the Court must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323, 127 S.Ct. 2499.

In examining Lopez's allegations, the Court is largely guided by the Second Circuit's opinion in *South Cherry*, a recent decision that dealt with facts similar to those involved in the case at hand. *See*

573 F.3d 98. In *South Cherry*, the Circuit Court confronted head on the allegations necessary to sustain a federal securities fraud claim against advisors who recommended investment in what was later revealed as a Ponzi scheme. The *South Cherry* plaintiffs alleged that defendant Hennessee Group recommended that they invest in Bayou Accredited, a hedge fund that turned out to be a Ponzi scheme. The federal securities fraud claim was premised on representations that Hennessee had made about performing "five levels of scrutiny" before recommending the investment. *Id.* at 100. These representations were made with a reckless disregard for the truth, South Cherry argued, because if Hennessee had actually performed their purported diligence, they would have discovered a number of troubling warning signs at Bayou Accredited, including that the fund's auditor was owned by one of the fund's principals and that the founder of the fund misrepresented his prior experience.

Such allegations—essentially that Hennessee Group had not performed any diligence before recommending Bayou Accredited—were not sufficient to state a federal securities fraud claim. The primary deficiency in the complaint was that it did not "contain an allegation of any fact relating to Bayou Accredited that (a) was known to Hennessee Group and (b) created a strong inference that H[ennessee] G[roup] had a state of mind approximating actual intent." *Id.* at 112. The complaint lacked allegations that, "during the period in which [Hennessee Group] was recommending Bayou Accredited," "there were obvious signs of fraud, or that the danger of fraud was so obvious that [Hennessee Group] must have been aware of it." *Id.* There were no allegations that "Hennessee Group did not believe the various Bayou funds' representations." *Id.* Instead, the allegations were premised on a conditional:

" '[i]f Hennessee Group had asked various questions earlier, it would have further questioned the Bayou Accredited financial records or recognized the need to ask further questions.' " *Id.* (alteration in original). Such allegations made out, at best, that "Hennessee Group had been negligent in failing to discover the truth." *Id.* at 113.

Finally, the Second Circuit found it more compelling that Hennessee Group had been duped by Bayou Accredited, because it was less plausible that an industry leader "would deliberately jeopardize its standing and reliability, and the viability of its business, by recommending to a large segment of its clientele a fund as to which it had made, according to South Cherry, little or no inquiry at all." *Id.*

■ Lopez's allegations face a similar fate here. His complaint is devoid of any allegations that "there were obvious signs of fraud, or that the danger of fraud was so obvious that [Standard Chartered] must have been aware of it." *Id.* at 112. Instead, the closest Lopez comes to scienter allegations is that Standard Chartered recommended Fairfield Sentry without conducting any diligence and that, if it had, the fraud would have been revealed. (*See* Lopez Complaint ¶¶ 41, 49.) As *South Cherry* makes clear, allegations that an advisor failed to investigate an investment are not sufficient to make out scienter on a § 10(b) claim.

### 2. *Section 20(a) Claim*

■ Lopez also alleges a § 20(a) claim against Standard Chartered PLC. In order to state a control person claim pursuant to § 20(a), Lopez must allege facts showing (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the targeted defendant"; and (3) that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated." *ATSI Com-*

*mun'cns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir.2007) (quotation marks omitted). As Lopez has not adequately alleged a primary violation, his § 20(a) claim necessarily fails.

### E. *FRAUD AND NEGLIGENT MIS-REPRESENTATION CLAIMS*

Lopez alleges common law fraud against Standard Chartered SCBI and Standard Chartered PLC, and the Maridom Plaintiffs allege fraud and negligent misrepresentation against SCBI.

Lopez's fraud claim is sparely pled and consists of nothing more than a reallegation of everything preceding it in the complaint, an assertion that Lopez has suffered damages in excess of $900,000, and a conclusory assertion that punitive damages are necessary in this case. (*See* Lopez Complaint, ¶¶ 93–95.) The Court therefore must assume Lopez's fraud claim is essentially identical to his § 10(b) claims.

■ In Florida, common law fraud has the same basic elements as a § 10(b) claim, except "the scienter requirement in a common-law fraud claim [under Florida law] is more stringent, since actual knowledge as to falsity is required." *Bruhl v. Conroy,* No. 03–23044, 2006 U.S. Dist. LEXIS 66387, at *30 (S.D.Fla. Mar. 31, 2006) (quotation marks omitted) (alteration in original). As Lopez has not sufficiently alleged scienter for a § 10(b) claim, his Florida common law fraud claim must also fail.

The Maridom Plaintiffs have better luck. They base their fraud and negligent misrepresentation actions against SCBI on essentially the same facts, framing their claims as involving a material omission and an affirmative misrepresentation. The omission is failing to disclose that Fairfield Sentry was a "funnel" to Madoff. (Maridom Complaint ¶ 53.) The misrepresentation is stating that Fairfield Sentry itself

would manage the Maridom Plaintiffs' investments when actually Madoff was doing so. (*Id.*)

Standard Chartered challenges these claims on two grounds: first, that the alleged omission and misstatement are not sufficiently alleged pursuant to Rule 9(b) and, second, that the Maridom Plaintiffs could not have relied on this information because it was appropriately disclosed in the Placement Memos.

■ Under Florida law, a negligent misrepresentation claim has the same elements as a fraud claim, except that the tortfeasor need not have actual knowledge as to the statement's falsity. *See Jaffe v. Bank of Am., N.A.,* 667 F.Supp.2d 1299, 1319 (S.D.Fl.2009). Instead, negligent misrepresentation is allowed if "the representor ... [1] kn[e]w of the misrepresentation, ... [2] ma[d]e the representation without knowledge as to its truth or falsity, or ... [3] ma[d]e the representation under circumstances in which he ought to have known of its falsity." *Atlantic Nat'l Bank of Florida v. Vest,* 480 So.2d 1328, 1331 (Fla.Dist.Ct.App.1985); *see also Goldweber v. Harmony Partners, Ltd.,* 09–CV–61902, 2010 WL 3702508, at *5 (S.D.Fla. Sept. 16, 2010) (same).

In addition to these requirements, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Particularity requires "that a complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach,* 355 F.3d at 170 (quotation marks omitted). Though the Second Circuit has not determined whether Rule 9(b) applies to negligent misrepresentation claims pleaded under New York state law, *see Eternity Global Master Fund Ltd. v.*

*Morgan Guar. Trust Co.,* 375 F.3d 168, 188 (2d Cir.2004), courts in the Eleventh Circuit have held that "Rule 9(b)'s pleading requirements apply to actions involving claims for negligent misrepresentation" under Florida law because such actions sound in fraud. *Johnson v. Amerus Life Ins. Co.,* No. 05–61363, 2006 WL 3826774, at *4 (S.D.Fla. Dec. 27, 2006).

■ Rule 9(b) requires rejection of the Maridom Plaintiffs' fraud and negligent misrepresentation claims premised on SCBI's falsely stating that Fairfield Sentry itself, rather than another entity, would manage the Maridom Plaintiffs' investments. The Maridom Complaint does not specify the speaker of these statements, or where and when these statements were made to each of the three Maridom Plaintiffs.

The application of Rule 9(b) to Standard Chartered's failure to disclose that Fairfield Sentry was a funnel to Madoff is not so clear-cut. Since these allegations concern a failure to speak, it is not possible to specify when and where this failure occurred. In such circumstances, "the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 293 (S.D.N.Y.2000), *aff'd,* 2 Fed.Appx. 109 (2d Cir.2001).

The Maridom Plaintiffs have satisfied this standard. They have alleged that SCBI failed to inform them of a specific fact when making an investment recommendation in order to induce the Maridom Plaintiffs to invest in the Fairfield Funds and thus cause a fee to be paid to SCBI. Though the Maridom Plaintiffs have not specified by name the particular SCBI employees who failed to disclose this informa-

tion, this is not fatal to their claims, particularly because SCBI should know which of their agents interacted with the Maridom Plaintiffs. Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Rombach*, 355 F.3d at 171 (quotation marks omitted). These objectives are satisfied here. The Court is not inclined to require the Maridom Plaintiffs to list every SCBI employee who, during the course of a multi-year relationship, may have been in the position to tell them information concerning Fairfield Sentry.

Next, the scienter requirement for fraud and its equivalent for negligent misrepresentation for failure to disclose is satisfied because the Maridom Complaint alleges that "SCBI had actual knowledge or was severely reckless," (Maridom Complaint ¶ 59), concerning their knowledge of Fairfield Sentry's funneling the Maridom Plaintiff's assets to Madoff.

As Standard Chartered has made no other relevant arguments concerning these causes of action, the Court finds that the Maridom Plaintiffs have properly alleged fraud and negligent misrepresentation claims relating to Standard Chartered's failure to disclose that Fairfield Sentry was a funnel to Madoff's operation.[7]

7. Even were the Court to review the Placement Memos, which are not properly before it, and consider Standard Chartered's assertion that Madoff's total control over Fairfield Sentry's assets was disclosed in the Placement Memos, the argument would be unavailing. In addition to general disclosures of risk that are not even facially persuasive, Standard Chartered points to a number of so-called disclosures in the October 2004 Placement Memo. These disclosures are at best opaque and would not defeat the Maridom Plaintiffs' claims.

The first section of the Placement Memo pointed to by Standard Chartered notes that Madoff "together with other qualified entities with which sub-custodial arrangements may be made ... serves as a sub-custodian for certain assets of [Fairfield Sentry]." (Berarducci Decl., Ex. X at 14.) "In addition, the underlying assets of the [non-split-strike conversion] investments managers may be held at Goldman, Sachs & Co., Refco, LLC, and other prime brokers and qualified custodians." (*Id.*) The section continues that "[c]urrently [Madoff] has approximately 95% of the Fund's assets under custody." (*Id.* at 15.) Next, Standard Chartered points to two other sentences in another portion of the Placement Memo: "The broker-deal[er] through which [Fairfield Sentry] conducts its [split-strike conversion] [i]nvestments, in its role as market-maker may effect transactions in equity securities with [Fairfield Sentry] as principal. This may provide such broker-dealer with the ability to use [Fairfield Sen-

try's] assets to enhance its securities market-making function." (*Id.* at 17, ¶ 4.)

Finally, Standard Chartered presents an anodyne disclaimer that reads in full: "When the Fund invests utilizing the 'split strike conversion' strategy or in a Non–SSC Investment vehicle, it will not have custody of the assets so invested. Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund." (*Id.* at 19, ¶ 17.)

These isolated representations do not add up to a disclosure that Fairfield Sentry was Madoff's playground. The first sections in question specify only that Madoff was one of many potential sub-custodians of the Fund's assets and, when the particular Placement Memo was drafted, that Madoff had 95 [percent] of Fairfield Sentry's assets under custody. An objective reader of the Placement Memo alone would have no reasonable way of knowing whether this situation was routine or exceptional, particularly since the Placement Memo used the word "[c]urrently," which suggests the situation was a fluid one. The next section relied on by Standard Chartered notes that Fairfield Sentry's "broker-dealer"—which would not lead a reasonable reader to Madoff's doorstep, since Madoff had previously been identified as "sub-custodian"—may use Fairfield Sentry's principal to make investments. The final section simply notes a truism: that someone who controls the money could steal it. Crucially, none of these statements ever discloses that Madoff

### F. FLORIDA'S ECONOMIC LOSS RULE

Standard Chartered contends that under Florida's economic loss rule all of Plaintiff's remaining common law claims must be dismissed because they relate to matters governed by an applicable contract. The Florida Supreme Court has "clearly stated" that Florida's economic loss rule is limited to two situations: "(1) where the parties are in contractual privity and one party seeks to recover damages in tort for matters arising out of the contract, or (2) where the defendant is a manufacturer or distributor of a defective product which damages itself but does not cause personal injury or damage to any other property," *Curd v. Mosaic Fertilizer, LLC*, 39 So.3d 1216, 1223 (Fla.2010).

The Florida Supreme Court's most recent examination of the economic loss rule is found in *Indemnity Insurance Company of North America v. American Aviation, Inc.*, 891 So.2d 532 (Fla.2004) (*"American Aviation"*). Prior to *American Aviation* and another case, *Moransais v. Heathman*, 744 So.2d 973 (Fla.1999), the rule had been "subject to some debate" and "ill-defined" "application and parameters." *Moransais*, 744 So.2d at 979. Indeed, the Florida Supreme Court's own "pronouncements on the rule have not always been clear" and, in the past, the court's "holdings have appeared to expand the application of the rule beyond its principled origins and have contributed to applications of the rule by trial and appellate courts to situations well beyond [the court's] original intent." *Id.* at 980.

Given the conflicting interpretations of the economic loss rule in Florida's lower courts, the Florida Supreme Court "ex-pressly limited" it in *American Aviation*. 891 So.2d at 542. Outside of the products liability context, the rule applies only "when the parties have negotiated remedies for nonperformance pursuant to a contract." *Id.* As part of its limiting doctrine, the Florida Supreme Court also listed exceptions to the newly-narrowed rule that applied even to parties to a contract, including "professional malpractice, fraudulent inducement, and negligent misrepresentation, or freestanding statutory causes of action." *Id.* at 543. The court also noted, without either obvious approval or disapproval, that some courts in Florida recognized other exceptions to the rule, namely "causes of action for breach of fiduciary duty, even if there was an underlying oral or written contract." *Id.* at 542 (*citing Invo Fla., Inc. v. Somerset Venturer, Inc.*, 751 So.2d 1263, 1266 (Fla.Dist.Ct. App.2000); *Performance Paint Yacht Refinishing, Inc. v. Haines*, 190 F.R.D. 699, 701 (S.D.Fla.1999)).

Standard Chartered argues that the economic loss rule applies because there are contracts governing the relationship between Plaintiffs and Standard Chartered. The Court is not persuaded. First, though Plaintiffs admit and the Court found above that contracts exist defining, at least in part, the relationship between Standard Chartered and Plaintiffs, those contracts are not properly considered at this stage. Therefore, the Court cannot determine to what extent "the parties have negotiated remedies for nonperformance pursuant to a contract." *Moransais*, 744 So.2d at 980.

■ Additionally, Florida's Third District Court of Appeals, the intermediate appellate court whose jurisdiction includes

---

was actually executing the split-strike conversion strategy, that he did so from the Fund's inception to its collapse, and that those transactions purportedly were Fairfield Sentry's lifeblood. Objectively, a reader would have to already know that Madoff effectively controlled Fairfield Sentry's investments to discern that conclusion from these cryptic statements.

Miami, Florida, where three of these cases were originally filed, has, following the Florida Supreme Court's lead, expressly held that claims for breach of fiduciary duty are not precluded under the rule, even if a contract otherwise governs the parties' relationship. *See Fixel v. Rosenthal & Rosenthal*, 842 So.2d 204, 209 (Fla. Dist.Ct.App.2003); *Invo Florida, Inc. v. Somerset Venturer, Inc.*, 751 So.2d 1263, 1266–67 (Fla.Dist.Ct.App.2000) (per curiam); *First Equity Corp. of Florida v. Watkins*, Nos. 98–851, 98–589, 1999 WL 542639 (Fla.Dist.Ct.App. July 28, 1999) (per curiam).

■ With no Florida Supreme Court precedent on point, "the judgment of an intermediate appellate state court 'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *New York v. Nat'l Serv. Indus.*, 460 F.3d 201, 211 (2d Cir. 2006) (quoting *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)). And though *American Aviation*'s citation to this line of precedent was ambiguous, there is no "persuasive data" that the Florida Supreme Court would overrule it. *See Florida Automobile Joint Underwriting Assoc. v. Milliman, Inc.*, No. 4:06cv546, 2007 WL 1341127, at *6 (N.D.Fla., May 3, 2007) (examining competing authorities and concluding that "the Florida Supreme Court will not disagree with the decisions of the Third District Court of Appeals."); *Kraft Co., Inc. v. J & H Marsh & McLennan of Florida, Inc.*, No. 2:06–CV–6, 2006 WL 1876995, at *3–*4 (M.D.Fla. July 5, 2006); *Performance Paint*, 190 F.R.D. at 701–02. *But see Lehman Bros. Holdings, Inc. v. Hirota*, No. 8:06–CV–2030, 2007 WL 1471690, at *4–*5 (M.D.Fla. May 21, 2007) (finding that economic loss rule barred fiduciary duty claim) (*citing Royal Sur-*

*plus Lines Ins. Co. v. Coachman Indus., Inc.*, 184 Fed.Appx. 894 (11th Cir.2006)).

## G. BREACH OF FIDUCIARY DUTY CLAIMS

■ All Plaintiffs allege breach of fiduciary claims. Under Florida law, "[t]he elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla.2002).

■ In Florida, a fiduciary relationship arises where "a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief. The origin of the confidence is immaterial." *Doe v. Evans*, 814 So.2d 370, 374 (Fla.2002) (quotation marks omitted) (emphasis removed). Such "[a] fiduciary relationship may be implied by law" and its formation depends heavily "upon the specific factual situation surrounding the transaction and the relationship of the parties." *Id.* (quotation marks omitted). Florida has also adopted § 874 of the Restatement (Second) of Torts, which provides that a breach of a fiduciary relationship "'is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.'" *Id.* (*quoting* Restatement (Second) of Torts § 874 cmt. b (1979)). In short, "[t]he term 'fiduciary or confidential relation' is a very broad one. It exists ... in all cases in which influence has been acquired and abused, and in which confidence has been reposed and betrayed." *Atlantic Nat'l Bank*, 480 So.2d at 1332.

The parties make much of whether Plaintiffs' accounts were discretionary or

not, and of the implications of this classification. Standard Chartered argues that if the accounts were nondiscretionary—meaning that Plaintiffs had the final word on what investments to make—the general rule is that Standard Chartered owed only a limited set of duties to Plaintiffs. *See Ward v. Atl. Sec. Bank,* 777 So.2d 1144, 1147 (Fla.Dist.Ct.App.2001) (describing duties owed by stockbroker to nondiscretionary account holder). On the other hand, if the relationship between the parties develops beyond a nondiscretionary one—if, for example, one party begins giving investment advice—the duties increase. *See id.* (noting that a general "fiduciary duty of loyalty and care" was owed once "[defendant b]ank ... contacted [plaintiff s]tockholder on its own initiative and allegedly advised [the s]tockholder not to sell his shares."). *See also de Kwiatkowski v. Bear, Stearns & Co., Inc.,* 306 F.3d 1293, 1307 (2d Cir.2002) (noting that a claim alleging failure to provide "ongoing, unsolicited advice ... is viable ... only if there is evidence to support [plaintiff's] theory that [defendant], notwithstanding its limited contractual duties, undertook a substantial and comprehensive advisory role giving rise" to a fiduciary duty).

For example, in *Capital Bank v. MVB, Inc.,* Florida's Third District Court of Appeals held that a bank had a fiduciary duty towards a customer to whom it had lent money, even though "[g]enerally, the relationship between a bank and its borrower is that of creditor to debtor, in which parties engage in arms-length transactions, and the bank owes no fiduciary responsibilities." 644 So.2d 515, 518 (Fla. Dist.Ct.App.1994). This fiduciary duty arose because one of the bank's agents "expressly invited [the customer's] reliance by urging [the customer] to trust him and by reassuring [the customer] that he was part of the [bank's] family." *Id.* at 520. The bank "also fostered [the customer's] perception that the bank was his financial advisor, by repeating that the bank's plans would benefit [the customer's] business." *Id.* Next, "special circumstances," including "orchestrating and finalizing" a transaction, also created a fiduciary relationship. *Id.* Though not directly applicable to the matter at hand because it arose in the context of a loan, this case aptly demonstrates that "[f]iduciary relationships implied in law are premised upon the specific factual situation surrounding the transaction and the relationship of the parties." *Id.* at 518. *See also Fixel,* 842 So.2d at 207–08 ("[Fiduciary] relationships are premised upon the specific factual situation surrounding the transaction and the relationship of the parties.") (quotation marks omitted).

■ Here, Plaintiffs sufficiently state causes of action for breach of fiduciary duty. All Plaintiffs allege that Standard Chartered's recommendation that they invest in the Fairfield Funds without conducting proper diligence was a breach of fiduciary duty. Even nondiscretionary broker-dealers have a duty to "recommend [investments] only after studying [them] sufficiently to become informed as to [their] nature, price, and financial prognosis," *Ward,* 777 So.2d at 1147 (quotation marks omitted) (first alteration in original), and Standard Chartered had a duty to do the same before recommending Fairfield Sentry. As Lopez and the Maridom Plaintiffs allege that a high-ranking Standard Chartered executive admitted that no diligence had been done on the Fairfield Funds, and Headway and Valladolid allege that no diligence was actually performed, a breach of fiduciary duty based on these facts is properly alleged. Standard Chartered's argument that it essentially had no duty to meaningfully investigate the Fairfield Funds cannot be resolved at this early stage of the litigation, especially given

that the duty alleged here is heavily fact-dependent and sharply disputed.

Next, three Plaintiffs—Lopez, Headway, and Valladolid—allege that Standard Chartered had a duty to continue to monitor their investments in the Fairfield Funds after they had been made. Standard Chartered argues that such a duty adheres only to discretionary accounts, *see de Kwiatkowski*, 306 F.3d at 1302 ("It is uncontested that a broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis."), and that none of these three Plaintiffs had such accounts.

First, for Lopez, such a contention is flatly contradicted by his complaint, which specifies his account was discretionary. (*See* Lopez Complaint ¶ 86.) Next, Headway and Valladolid, though not explicitly alleging that their accounts were discretionary, allege sufficient facts at this stage of the proceeding to adequately support their claim for a breach of fiduciary duty based on Standard Chartered's failure to monitor their investments. Headway alleges that a number of Standard Chartered employees made continued recommendations for over one-and-a-half years to invest in the Fairfield Funds, resulting in Headway making five separate investments totaling millions of dollars. Some of these employees also allegedly told Headway that they possessed "the skills and expertise necessary to research, analyze, and monitor the investments recommended to Headway." (Headway Complaint ¶ 37.) Headway also alleges that Standard Chartered "pushed the relationship managers to promote and recommend the Fund." (*Id.* ¶ 75.)

Valladolid alleges she was "assured ... that [Standard Chartered was] in the business of advising and protecting investors" and that Standard Chartered became her "investment guide for making investments in the United States." (Valladolid Com-

plaint ¶ 9.) Such assurances came in the form of Valladolid's "relationship manager" "boast[ing] ... of the care [Standard Chartered] took in evaluating investments for its customers ... [and] boast[ing] about the performance of various investment funds, singling out [Fairfield Sentry] as particularly impressive given its long term success." (*Id.* ¶ 41.)

In both Headway and Valladolid's allegations, Standard Chartered was far more than a passive broker taking orders; instead, Standard Chartered is alleged to have reached out to Plaintiffs and aggressively marketed an investment with the Fairfield Funds by touting the long-term performance, stability, and returns of these funds and representing that it was in the business of advising as to such investments. At this stage, these alleged interactions sufficiently show that Valladolid placed her trust and confidence in Standard Chartered such that it could have given rise to a duty to continue monitoring her investment with Fairfield Sentry.

Standard Chartered's remaining contentions surrounding the breach of fiduciary duty claims are of no moment. Standard Chartered argues that so-called "exculpatory clauses" in Plaintiffs' contracts dissolve all liability. As noted, these agreements are not properly before the Court at this time, except in Valladolid's case. The relevant clause in Valladolid's NISA limits liability only to acts arising from "gross negligence, willful misconduct or bad faith." (Berarducci Decl., Ex. O ¶ 5(d).) Assuming that this clause is valid and applicable, the Court is not persuaded that Standard Chartered's alleged breach of fiduciary duty in recommending and failing to monitor Valladolid's investment falls below the level of gross negligence as a matter of law, particularly given the extensive warning signs of Madoff's fraud that

Valladolid's Complaint alleges were known to Standard Chartered.[8]

Finally, Standard Chartered argues that Madoff's fraud was an intervening cause severing Standard Chartered from all liability. The Court is not persuaded, *see Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 118, 728 F.Supp.2d 372, 412–13, 446–47, 2010 WL 3341636, at *26, *59 (S.D.N.Y. Aug. 18, 2010), particularly here where Plaintiffs assert numerous warning signs of Madoff's fraud allegedly-known to Standard Chartered. *See also Gibson v. Avis Rent–A–Car System, Inc.*, 386 So.2d 520, 522 (Fla.1980) ("The question of whether an intervening cause is foreseeable is for the trier of fact.")

## H. *GROSS NEGLIGENCE CLAIM*

Lopez alleges a gross negligence claim against SCBI and Standard Chartered PLC that is essentially his breach of fiduciary duty claim with a different heading. In his cause of action for gross negligence, Lopez repeats all of the prior allegations of his complaint and then reiterates almost word for word the same legal conclusions that state his breach of fiduciary duty claim. (*See* Lopez Complaint ¶¶ 84–88.) Even were the Court to consider this cause of action as one completely separate from the breach of fiduciary duty claim, it is properly alleged.

The Florida Supreme Court has defined gross negligence as "an act or omission that a reasonable, prudent person would know is likely to result in injury to another." *Travelers Indem. Co. v. PCR, Inc.*, 889 So.2d 779, 793 n. 17 (Fla. 2004) (quotation marks omitted). Here, Lopez alleges that Standard Chartered has admitted it conducted no diligence on the Fairfield Funds, but aggressively recommended them anyway. Such action— recommending that an investor place hundreds of thousands of dollars in an investment without the financial institution doing anything to ensure the investment was sound—satisfies the standard of gross negligence under Florida law.[9]

## I. *UNJUST ENRICHMENT CLAIMS*

Lopez, Valladolid and Headway allege unjust enrichment. "An unjust enrichment claim can exist only if the subject matter of that claim is not covered by a valid and enforceable contract." *In re Managed Care Litig.*, 185 F.Supp.2d 1310, 1337 (S.D.Fla.2002). As these Plaintiffs

---

8. The Court also notes that Valladolid's NISA apparently contains a mandatory arbitration clause. (*See* Berarducci Decl., Exs. N & O, ¶ 9(a)); *see also Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 118, 728 F.Supp.2d 462, 2010 WL 3431126 (S.D.N.Y. Aug. 20, 2010) (examining identical document in prodigious detail).

9. Standard Chartered argues that a more onerous pleading burden applies to gross negligence claims under Florida law, contending that "to hold a party liable for gross negligence, one must find that the defendant had knowledge of the existence of circumstances which constitutes a clear and present danger and yet still undertakes a conscious, voluntary act or omission ... which is likely to result in injury." *Greathouse v. Ceco Concrete Constr., LLC*, No. 5:06cv2, 2007 WL 624550, at *3, 2007 U.S. Dist. LEXIS 12656, at *9–*10 (N.D.Fla. Feb. 23, 2007) (quotation marks and alterations omitted) (*citing Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1377 (11th Cir.2000)). This formulation ultimately flows from *Glaab v. Caudill*, 236 So.2d 180 (Fla.Dist.Ct.App. 1970), but has never been adopted by the Florida Supreme Court, even though *Glaab* was decided in 1970. *Glaab*'s only citation by the Florida Supreme Court was to support a less stringent standard, that "[g]ross negligence ... is defined as an act or omission that a reasonable, prudent person would know is likely to result in injury to another." *Eller v. Shova*, 630 So.2d 537, 541 n. 3 (Fla. 1993) (*citing Glaab*, 236 So.2d 180). The Court is therefore not persuaded that Lopez must satisfy *Glaab*'s standard.

explicitly or implicitly refer to agreements between themselves and Standard Chartered, the Court dismisses the unjust enrichment claims. In the event that discovery reveals that the agreements in question are not valid or otherwise applicable, or do not bind all parties, the unjust enrichment claims may be repleaded.

### J. *LEAVE TO REPLEAD*

Though a court "should freely give leave" to amend "when justice so requires," Fed.R.Civ.P. 15(a)(2), "it is within the sound discretion of the district court to grant or deny leave to amend. A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.2007) (citations omitted).

The Court has determined that several of Plaintiffs' allegations failed to state a claim, due chiefly to failures of properly alleging scienter in Lopez's fraud-based claims and specificity in similar claims of the Maridom Plaintiffs. It is therefore possible that as to some of these matters repleading would be futile if based upon the same or similar allegations. The Court will grant leave to replead upon a prior request by Plaintiffs plausibly showing how such repleading would correct the deficiencies identified in the Court's findings discussed above, and thus would not be futile. Plaintiffs may submit any such request within twenty-one days of the date of this Order.

### III. *ORDER*

Accordingly, it is hereby

**ORDERED** that the Court's Order dated September 29, 2010 herein is amended to incorporate the discussion set forth above; and it is further

**ORDERED** that the motion of defendants Standard Chartered Bank International (America) Ltd., Standard Chartered Bank, Standard Chartered PLC, and Standard Chartered International (USA) Ltd., to dismiss the complaint (Docket No. 384) is GRANTED in part and DENIED in part; it is further

**ORDERED** that defendants Luisa Serena, Carlos Gadala–Maria, Raul N. Mas, Robert Friedman, Rodolfo Pages, Samuel Perruchoud, and John G. Dutkowski are dismissed from this action; it is finally

**ORDERED** that plaintiffs Headway Investment Corp., Maria Arkiby Valladolid, Ricardo Lopez, Maridom Ltd., Caribetrans, S.A., and Abbot Capital, Inc., herein are granted leave to replead upon submitting to the Court, within twenty-one days of this Order, an application therefor plausibly showing how such repleading would correct the deficiencies identified in the Court's findings discussed above, and thus would not be futile.

**SO ORDERED.**